## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AARON HOPE,                    :
et al.,                        : NO. 1:CV-20-0562
    **Petitioner-Plaintiffs**      :
                          : (Jones, J.)
          v.                 :
                          :
**CLAIR DOLL, in his official**  :
**Capacity as Warden of York**   :
**County Prison, et al.,**        :
    **Respondents-Defendants**    :

## DECLARATION OF JOSEPH DUNN

    I, Joseph Dunn, hereby make the following declaration with respect to the above-captioned matter:

1. I am the Assistant Field Office Director (AFOD) with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) in the Philadelphia Field Office (ERO York). I have held this position since August 2011.

2. In my capacity as Assistant Field Office Director, I am responsible for the direction and oversight of ICE immigration enforcement operations within the Commonwealth of Pennsylvania. My office is responsible for identification, apprehension, and removal of illegal aliens from the United States, to include the detention of those determined to pose a risk of flight or danger to the community while they are going through removal proceedings.

3. This declaration is based upon knowledge and information obtained from various records and systems maintained by DHS in the regular course of business as well as information obtained from my colleagues. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above-captioned case.

4. ICE is charged with removing aliens who lack lawful immigration status in the United States. Detention is an important and necessary part of immigration enforcement. ICE detains people to secure their presence both for immigration

proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law.

5. The York County Prison has the capacity to house 2,245 inmates and has historically often operated near capacity. As of the morning of April 7, 2020, however, there are only 1,341 combined male and female inmates and detainees housed as the facility. As such, the York County Prison has a current population within its approved capacity and is not overcrowded.

6. The Pike County Correctional Facility has the capacity to house 375 detainees and has historically often operated near capacity. As of the morning of April 3, 2020, however, there are only 221 combined inmates and detainees housed as the facility. As such, the Pike County Prison has a current population within its approved capacity and is not overcrowded.

7. Since the onset of reports of Coronavirus Disease 2019 (COVID-19), I have been informed that ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees.

8. I have been informed that ICE and the ICE Health Service Corps (IHSC) are also following guidance issued by the U.S. Centers for Disease Control (CDC) to safeguard those in its custody and care. It is my understanding that the York and Pike County Prisons are following CDC guidance, including the Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities, at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

9. I have been informed that each detainee is screened for disabilities upon admission. Identified disabilities are further evaluated and reasonable accommodations are provided as medically appropriate.

10. At the York and Pike County Prisons, during intake medical screenings, detainees are assessed for fever and respiratory illness, are asked to confirm if they have had close contact with a person with laboratory-confirmed COVID-19 in the past 14 days, and whether they have traveled from or through area(s) with sustained community transmission in the past two weeks.

11. The detainee's responses and the results of these assessments will dictate whether to monitor or isolate the detainee. Detainees who present symptoms

compatible with COVID-19 will be placed in isolation, where they will be tested. If testing is positive, they will remain isolated and treated. In case of any clinical deterioration, they will be referred to a local hospital.

12.     I have been informed that in cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in cohorts with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill detainee) and are monitored daily for fever and symptoms of respiratory illness. Cohorting is an infection prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic. This practice lasts for the duration of the incubation period of 14 days, because individuals with these and other communicable diseases can be contagious before they develop symptoms and can serve as undetected source patients.  Those that show onset of fever and/or respiratory illness are referred to a medical provider for evaluation. Cohorting is discontinued when the 14-day incubation period completes with no new cases. Per ICE policy, detainees diagnosed with any communicable disease who require isolation are placed in an appropriate setting in accordance with CDC or state and local health department guidelines.

13.     The York and Pike County Prisons have the following medical capabilities:

   a. The York County Prison, which manages both males and females, provides daily access to sick calls in a clinical setting and has onsite medical staff 24 hours a day, 7 days a week with the ability to admit patients to the local hospital for medical, specialty, or mental health care.

   b. The Pike County Prison, which manages both males and females provides daily access to sick calls in a clinical setting and has onsite medical staff 24 hours a day, 7 days a week with the ability to admit patients to the local hospital for medical, specialty, or mental health care.

14. The York and Pike County Prisons have indicated that they have increased sanitation frequency and provide sanitation supplies as follows:

   a. The York County Prison provides soap, water, and hard surface disinfectant in every housing unit at the prison.  All staff are provided access to hand sanitizer.  Prison staff clean high traffic and contact areas

repeatedly throughout the day. The administration is encouraging both staff and the general population to use these tools often and liberally.

b. The Pike County Prison provides soap, water, and hard surface disinfectant in every housing unit at the prison. The staff is provided access to hand sanitizer. All high traffic and contact areas within each housing united are cleaned repeatedly throughout the day. The administration is encouraging both staff and the general population to use these tools often and liberally.

15. The York and Pike County Prisons indicate that they are screening all staff and vendors when they entered the facilities including body temperatures.

16. The York and Pike County Prisons indicate that they are screening all detainee intakes when they enter the facilities including travel histories, medical histories, and checking body temperatures and have procedures in place to continue monitoring the populations' health.

17. The York and Pike County Prisons have limited professional visits to noncontact visits and suspended in person social visitation and facility tours.

18. The York and Pike County Prisons provide education on COVID-19 to staff and detainees to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting to seek medical care if they feel ill. The facilities provide detainees daily access to sick call.

19. The York and Pike County Prisons have identified housing units for the quarantine of patients who are suspected of or test positive for COVID-19 infection to be addressed as set forth in paragraphs 10, 11, and 12, supra.

20.   To provide context for the reasons why each of the Plaintiffs are in ICE custody at the York and Pike County prisons, ICE has conducted a preliminary review of their case histories and each follows.

a. Glen Arthur Weithers is a native and citizen of Guyana detained at the York County Prison. He was admitted to the United States on August 13, 1988 as a lawful permanent resident. The Alleghany County Court of Common Pleas, Pennsylvania convicted him of Possession of Cocaine, in violation of 35 Pa. C.S. § 780-1 13(a)(16) and sentenced to

12 months of probation. The Department of Homeland Security ("DHS") commenced removal proceedings on January 10, 2019, through the issuance of a Notice to Appear (NTA). DHS charged him with being removable or inadmissible to the United States, pursuant to § 237(a)(2)(B)(i) of the Immigration and Nationality Act ("INA" or the "Act."). The Immigration Court sustained the charge. On April 30, 2019, the Immigration Court ordered Weithers removed from the United States to Guyana. Weithers appealed to the Board of Immigration Appeals who dismissed the appeal on January 16, 2020. Weithers was scheduled for removal during the first week of April on a flight out of JFK airport in New York City. Due to COVID-19 concerns his removal was postponed and has already been rescheduled.

  i. Weithers has a criminal history that spans almost three decades with approximately 15 arrests and eight convictions. His criminal history includes four DUI convictions, two which include physical injuries to others. He continued to drive after losing his license in 2012 or 2013. His extensive criminal history is as follows. On April 23, 2018, he was convicted of DUI (4th offense) driving with a suspended license, 2 counts of accidents involving injury or death, unauthorized use of a motor vehicle, reckless driving, and accident involving damage to attended vehicles or property. He was sentenced to one to two years' incarceration in a state correctional facility and 18 months' probation.

 ii. On June 7, 1992, Weithers was arrested by the East Orange Police Department in East Orange, New Jersey and charged with Aggravated Assault - Weapon, and 2 counts of Possession of a weapon. On June 8, 1992, Weithers was convicted in the East Orange Municipal Court, in East Orange, New Jersey for one count of Disorderly Conduct, in violation of NJ 2 C 33-2. He was sentenced to 180 days suspended confinement and a $125 fine.

iii. On May 11, 1998, Weithers was arrested by the Newark Police Department in Newark, New Jersey and charged with Aggravated Assault, and Resisting Arrest. On July 7, 1998, Weithers was convicted in the Newark Municipal County Criminal Court, in Newark, New Jersey, for one count of Simple Assault, in violation of 2C:12-1A(1). He was sentenced to one-

year probation.

iv. On July 12, 2000, Weithers was arrested by the Newark Police Department in Newark, New Jersey and charged with Contempt, and Contempt - Violate Domestic Violence. On September 1, 2000, the charges were dismissed.

v. On July 10, 2001, Weithers was arrested by the Newark Police Department in Newark, New Jersey and charged with Terroristic Threats, Bail Jumping, and Harassment. On August 30, 2001, the charges were dismissed.

vi. On February 22, 2004, Weithers was arrested by the Pittsburgh Police Department in Pittsburgh, Pennsylvania and charged with Access Device Fraud. On March 3, 2004, the charges were dismissed.

vii. On July 30, 2010, Weithers was arrested by the Doraville Police Department in Doraville, Georgia and charged with DUI. On January 14, 2011, the charges were dismissed.

viii. On January 16, 2011, Weithers was arrested by the Lawrenceville Police Department in Lawrenceville, Georgia and charged with DUI. On February 14, 2011, he was convicted in the Lawrenceville Municipal Court, in Lawrenceville, Georgia for one count of DUI, in violation of GA 40-6-391(a)(1). He was sentenced to 1-day confinement, 40 hours community service, 12 months' probation, a $570 fine, and alcohol and drug treatment.

ix. On May 20, 2012, Weithers was arrested by the Mount Oliver Police Department in Pittsburgh, Pennsylvania and charged with Public Drunkenness and Aggravated Assault. On May 30, 2012, all charges were dismissed.

x. On September 7, 2012, Weithers was arrested by the Pittsburgh Police Department in Pittsburgh, Pennsylvania and charged with DUI: Gen Imp/Inc of Driving Safely - 2nd Of., DUI: Gen Imp/Inc of Driving Safely - 3rd Off, Resist Arrest/Other Law Enforce, Careless Driving, Improper Turn / Green Light, and Reckless Driving. On July 11, 2013, He pled guilty in the Court

of Common Pleas in Allegheny County, Pennsylvania, for one count of DUI: Gen Imp/Inc of Driving Safely - 2nd Off, in violation of 75 § 3802A1 and was sentenced to 90 days Intermediate Punishment Program and 2 years' probation. Weithers also pled guilty to DUI: Gen Imp/Inc of Driving Safely - 3rd Off, in violation of 75 § 3802A1 where he received no further penalty.

xi.   On January 24, 2013, Weithers was arrested by the Pittsburgh Police Department in Pittsburgh, Pennsylvania and charged with Simple Assault and Terroristic Threats. On January 31, 2013, all charges were withdrawn.

xii.   On February 27, 2015, Weithers was arrested by the Pittsburgh Police Department in Pittsburgh, Pennsylvania and charged with DUI: High Rte of Alc (BAC .10 - .16) 3rd Off, DUI: Gen Imp/Inc of Driving Safely - 3rd Off, Driving While BAC .02 or Greater While License Susp, BAC .02 or Greater 2nd Offense, Accident Involv Damage Attended Vehicle/Prop, DUI: Gen Imp/Inc of Driving Safely - 1st Of, and Careless Driving. On March 29, 2016, He pled guilty in the Court of Common Pleas in Allegheny County, Pennsylvania tor one count DUI: High Rte of Alc (BAC .10 - .16) 3rd Off, in violation of 75 § 3802B and was sentenced to 120 days Intermediate Punishment Program and 3 years of Probation. Weithers also pled guilty to Driving While BAC .02 or Greater While License Susp, in violation of 75 § 1543B1 and was sentenced to 60 days Intermediate Punishment Program. Additionally, Weithers also pled guilty to 3 counts of DUI: Gen Imp/Inc of Driving Safely - 3rd Off, in violation of 75 § 3802A1 where he received no further penalty.

xiii.   On August 15, 2015, Weithers was arrested by the Pittsburgh Police Department in Pittsburgh, Pennsylvania and charged with Patronizing Prostitutes, Criminal Solicitation - Patronizing Prostitutes, Int Poss Contr Subst By Per Not Reg, Drg Lic Sus/Rev Purs to Sec 3802/1547B1, and Int Poss Contr Subst By Per Not Reg. On March 29, 2016, he pled guilty in the Court of Common Pleas in Allegheny County, Pennsylvania, for one count Intent to Possess a Controlled Substance by Person Not Registered; to wit Cocaine, in violation of 35 § 780-113 A16 and

was sentenced to 12 months' Probation and $500 in fines. He also pled guilty to Drg Lic Sus/Rev Purs to Sec 3802/1547B1, in violation of 75 § 1543 B1 and was sentenced to 60 days Intermediate Punishment Program. Additionally, Weithers also pled guilty to Patronizing Prostitutes, in violation of 18 § 5902 and Criminal Solicitation - Patronizing Prostitutes, in violation 18 § 902A where he received no further penalty.

xiv.  On April 23, 2017, Weithers was arrested by the Pittsburgh Police Department in Pittsburgh, Pennsylvania and charged with Disorder Conduct Hazardous/Physi Off, Public Drunkenness And Similar Misconduct, Resist Arrest/Other Law Enforce, and Defiant Trespasser. On July 19, 2017, all charges were withdrawn.

xv.   On June 1, 2017, Weithers was arrested by the Pittsburgh Police Department in Pittsburgh, Pennsylvania and charged with Terroristic Threats W/ Int To Terrorize Another, 2 counts of Accidents Involving Death Or Personal Injury, Unauth Use Motor/Other Vehicles, Accident Involv Damage Attended Vehicle/Prop, DUI: Gen Imp/Inc of Driving Safely - 1st Off, Drg Lic Sus/Rev Purs to Sec 3802/1547B1, and Reckless Driving. On April 23, 2018, He pled guilty in the Court of Common Pleas in Allegheny County, Pennsylvania, for one count of the offense of DUI: High Rte of Alc (BAC .10 - <.16) 4th Off or Subsequent, in violation of 75 § 3802 B and was sentenced to one to two years imprisonment. Weithers also pled guilty to one count of the offense of Drg Lic Sus/Rev Purs to Sec 3802/1547B1, in violation of 75 § 1543B1 and was sentenced to 60 days incarceration. Additionally, he also pled guilty to two counts of the offense of Accidents Involving Death Or Personal Injury, in violation of 75 § 3742A and was sentenced to 18 months' probation. Finally, Weithers also pled guilty to one count of the offense of Unauthorized Use Motor/Other Vehicles, in violation of 18 § 3928 and Reckless Driving, in violation of 75 § 3736A where he received no further penalty.

xvi.  On July 12, 2017, Weithers was arrested by the Brentwood Borough Police Department in Pittsburgh, Pennsylvania and charged with 2 counts of Disorder Conduct Hazardous/Physi Off, Harassment - Subject Other to Physical Contact, Public

Drunkenness And Similar Misconduct, Resist Arrest/Other Law Enforce, Simple Assault, and Aggravated Assault. On March 1, 2018, Weithers pled guilty in the Court of Common Pleas in Allegheny County, Pennsylvania, for 2 counts of Disorder Conduct, in violation of 18 § 5503 § A4. For each of these counts he was sentenced to imprisonment for a term of 30 days. He also pled guilty to one count of the offense of Harassment - Subject Other to Physical Contact, in violation of 18 § 2709 A1 and Public Drunkenness and was sentenced to 30 days imprisonment on each offense.

b. Ismail Muhammed is a native and citizen of Pakistan. On January 30, 2002, U.S. Customs and Border Protection (CBP) admitted Muhammad to the United States at New York, NY as a lawful permanent resident (IR5). On February 25, 2016, he submitted an Application for Naturalization, Form N-400, to U.S. Citizenship and Immigration Services (CIS). On January 29, 2018, HSI submitted a request to CIS requesting they suspend the adjudication of Muhammad's N-400 based on a pending criminal investigation. The N-400 remains suspended.

   i. On January 29, 2018, HSI submitted a request to CIS requesting they suspend the adjudication of Muhammad's N-400 based on a pending criminal investigation. The N-400 remains suspended.

   ii. Pursuant to its authority derived from the International Economic Powers Act (IEEPA), the Department of Commerce (DOC) reviews and controls the export of certain goods and technologies from the United States to foreign countries. In particular, the DOC promulgated Export Administrative Regulations (EAR), which placed restrictions on the export of goods and technologies determined to significantly contribute to the military potential or nuclear proliferation of other nations that could be detrimental to the national security of the United States. The DOC first published an "Entity List" in February of 1997, which contains a list of certain foreign persons, businesses, research institutions, government and private organizations that are subject to specific license requirements for the export, re-export and/or in-country transfer of specified items. On November 19, 1998, the DOC added the Pakistan Atomic Energy Commission (PAEC), the Space and Upper Atmosphere Research Commission

(SUPARCO) and the National Institute of Lasers and Optronics (NILOP) to the Entity List.

iii. From 2012 through December of 2016, Muhammad, along with his sons Imran Khan and Muhammad Khan, engaged in a scheme to purchase goods that were controlled under the EAR and to export those goods without a license to Pakistan in violation of the EAR. Through companies conducting business as Brush Locker Tools Kauser Enterprises-USA and Kauser Enterprises-Pakistan, Muhammad and his sons received orders from a Pakistani company that procured materials and equipment for the Pakistani military. The company specifically requested them to procure products that were subject to the EAR. When U.S. manufacturers asked about the end-user for a product, Muhammad and his sons informed the manufacturers that the product would remain in the U.S. or completed an end-user certification indicating that the product would not be exported. After the products were purchased, they were shipped by the manufacturer to Muhammad and his sons in Connecticut. Muhammad and his sons then shipped the products to Pakistan on behalf of either PAEC, SUPARCO or NILOP, all of which were listed on the DOC Entity List. Muhammad and his sons never obtained a license to export any items to the designated entities even though they knew that a license was required prior to export. Muhammad and his sons received the proceeds for the sale of the export-controlled items through wire transactions.

iv. On December 13, 2016, a taskforce comprised of HSI, the FBI, the DOC, the Defense Criminal Investigative Service (DCIS), and the U.S. Postal Service (USPS) arrested Muhammad and his sons. On July 18, 2018, DCCT convicted Muhammad for the offence of international money laundering, in violation of Title 18, U.S.C., §§ 1956(a)(2)(A) and 2. DCCT sentenced Muhammad to incarceration for a period of 18 months. On July 26, 2018, he appealed the conviction to the U.S. Court of Appeals for the 2nd Circuit. On August 6, 2019, the 2nd Circuit dismissed Muhammad's appeal. On August 7, 2019, ERO Philadelphia encountered Muhammad at MVCC and lodged an Immigration Detainer – Notice of Action, Form I-247A.

v. On December 27, 2019, MVCC released Muhammad to ERO Philadelphia custody, who detained him at the Clinton County Correctional Facility (CCCF) in McElhattan, PA. On the same date, ERO Philadelphia issued MUHAMMAD a Notice to Appear, Form I-862, charging removability pursuant to § 237(a)(4)(A)(i) of the Immigration and Nationality Act (Act), as an alien who engaged in any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information. On March 11, 2020, Muhammad was ordered removed from the United States to Pakistan. As he waived his appeal rights, the order is final. In addition, ICE reviewed Muhammed for release as part of its COVID-19 protocols and determined that continued detention was appropriate given his criminality and the guidelines for enforcement during the COVID-19 pandemic.

c. Konstantin Bugarenko is a native and citizen of the Ukraine who entered the United States on July 26, 1997 as a lawful permanent resident. He is currently detained at the York County Prison. On December 17, 1998, he was convicted of two counts of Aggravated Assault in violation of 18 Pa.C.S.A. § 2702 and sentenced to eleven months and 15 days to 23 months imprisonment. The 1998 incident also resulted in a DUI conviction. On January 28, 2005, March 9, 2005, and January 11, 2017, Bugarenko was convicted for DUI. He was respectively sentenced to one year, two years, and six months imprisonment. On October 25, 2017, DHS commenced removal proceedings with the filing of a NTA, charging him with being removable for having been convicted of a crime involving moral turpitude committed within five years after admission for which one year or longer may be imposed. On December 6, 2017, the Immigration Court denied Bugarenko's request to be released on bond because he was subject to mandatory detention under INA § 236(c) also finding that Bugarenko was a danger to the community. On May 17, 2018 the BIA affirmed the Immigration Court's denial. On July 17, 2018, the Immigration Court denied Bugarenko's application for adjustment of status and ordered him removed to the Ukraine. On January 7, 2019, the BIA upheld the Immigration Court's decision and dismissed Bugarenko's appeal. Bugarenko then filed a petition for review with the Third Circuit Court of Appeals. On January 18, 2019, the Third

Circuit issued a temporary stay of removal. After he was ordered removed, Bugarenko filed a motion to reopen to the BIA which was denied on April 17, 2019. He then filed a second PFR with the Third Circuit Court of Appeals. On May 9, 2019, Bugarenko filed a second motion for a custody redetermination, this time pursuant to Guerrero-Sanchez v. Warden, York County Prison. On July 18, 2019, the Immigration Court denied Bugareko's motion for bond finding that he constituted a danger to the community and flight risk. On February 6, 2020, the BIA again affirmed the Immigration Court's decision. In addition, ICE reviewed Bugarenko for release as part of its COVID-19 protocols and determined that although he is on the chronic care list for, among other issues, high blood pressure, continued detention was determined given his criminality and the guidelines for enforcement during the COVID-19 pandemic. On January 23, 2020, the Third Circuit Court of Appeals dismissed in part and denied in part Bugarenko's PFR's. DHS is waiting for the Third Circuit Court of Appeals to issue its mandate to schedule Bugarenko's removal.

d. Paul Wilders is a native and citizen of Haiti who is currently detained at the York County Prison. Wilders's immigration case has a long history. His case was scheduled for a merits hearing before the Immigration Court on March 31, 2020, but that is in the process of being rescheduled. On November 16, 209, he was arrested in Laurel, Delaware and charged with DUI (4th offense), possession/consummation of marijuana other than personal use quantity, endangering welfare of a child while DUI, driving while suspended or revoked, failure to have required insurance, expired tags, fictitious or cancelled registration card or plate, operation of an unregistered vehicle, and driving at unreasonable or imprudent speed. These charges are still pending. On March 1, 2017, he was arrested in Laurel, Delaware and charged with resisting arrested. He was convicted on September 13, 2017 and sentenced to one-year imprisonment. On June 13, 2015, he was arrested by the Delaware State Police and charged with DUI (3rd offense). On February 8, 2016, he was convicted and sentenced to 9 months imprisonment. On August 11, 2011, he was arrested in Laurel, Delaware and charged with reckless driving/alcohol or drug related. He was convicted on December 19, 2011 and sentenced to 30 days. On July 7, 2007, he as arrested by the Delaware State Police for possession of drug paraphernalia. On November 27, 2007, he was convicted and sentenced to a fine. On February 12, 2007, he was

arrested in Seaford, Delaware and charged with underage possession/consumption of alcohol He was convicted on February 27, 2007 and sentenced to a fine. On May 13, 2006 he was arrested in Blades, Delaware and charged with driving by under the age of 21 after consumption of alcohol. On June 9, 2006, he was found guilty and sentenced to a fine. On May 13, 2006, he was arrested by the Delaware State Police and charged with sexual harassment threat to engage in conduct that would result in a sex offense. On July 30, 2006, he was convicted and sentenced to 12 months. On January 29, 2009, he was arrested by the Delaware State Police and charged with assault in the third degree, intentionally/recklessly causing physical injury. On July 30, 2002, he was convicted and sentenced to pay a fine. In addition, ICE reviewed Wilders for release as part of its COVID-19 protocols and determined that although he is on the chronic care list, continued detention was determined given his criminality and the guidelines for enforcement during the COVID-19 pandemic.

e. Marcos Ortiz Matos is a native and citizen of the Dominican Republic who entered the United States at an unknown time and location without permission or parole. He was placed into removal proceedings with the service of a NTA on November 29, 2019. On February 27, 2020, Immigration Court denied Ortiz Matos a custody redetermination finding that he was a danger to the community. On March 17, 2020, he was ordered removed from the United States to the Dominican Republic. On April 16, 1997, was arrested by the Philadelphia Police Department and charged with DUI. He was found guilty on September 24, 1997. On November 21, 1997, he was arrested by the Philadelphia Police Department using the alias Ramon Luna and charged with DUI. These charges were dismissed on June 15, 1998. On March 17, 1998, he was arrested by the Philadelphia Police Department and charged with DUI. On June 23, 1998, he was found not guilty. On April 21, 2011, he was arrested by the Philadelphia Police Department ant charged with possession with the intent to deliver heroin. A bench warrant was issued for his arrest on May 11, 2011. This warrant remained outstanding until September 13, 2019, when Ortiz Matos was finally apprehended. The charges appear to be pending.

f. Aaron Hope is a native and citizen of Trinidad and Tobago who is detained at the York County Prison. On November 5, 1997, he entered the United States as a B-2 visitor. On August 14, 2007, he adjusted

status to Conditional Permanent Resident. On May 10, 2010, his conditions were removed, and he became a Lawful Permanent Resident. On October 17, 2013 the Supreme Court in NY County convicted Hope of Identity Theft-1st degree and sentenced him to two to four years in prison. On February 19, 2013, the Supreme Court in NY County, convicted Hope of Grand Larceny-3rd degree, and Identity Theft-2nd degree. The subject was sentenced to five years' probation. Hope also has an arrest in Florida in 2011 for Assault on Police Officer. Records indicate the charges were later dismissed. Hope was first placed into removal proceedings in 2014. On November 3, 2014, Hope was granted cancellation of removal. On March 24, 2017, Hope was convicted before the U.S. District Court for the Western District of Tennessee of Conspiracy to Pass or Attempt to Pass Altered Money Orders and Aiding and Abetting. He was sentenced to 24 months incarceration. After this conviction Hope was again placed into removal proceedings where he was ordered removed from the United States to Trinidad and Tobago. On February 28, 2020, Hope filed an appeal to the BIA. This appeal is pending. On March 28, 2020, Hope was placed into disciplinary segregation after noncompliance with YCP staff resulting in a use of force incident.

g. Iwan Rahardia is a native and citizen of Indonesia currently detained at the York County Prison. On July 31, 2001, he was admitted to the United States at New York, NY as a nonimmigrant Visitor for Business (B1) authorized to remain in the United States until October 30, 2001. He failed to depart as required. On August 21, 2002, Rahardia was served with an I-862, Notice to Appear, pursuant to 237(a)(1)(B) of the Immigration and Nationality Act (INA). On October 2, 2002, he was granted asylum by the Immigration Court in Philadelphia, PA. This decision was appealed to the Board of Immigration Appeals (BIA). On May 9, 2005, the case was remanded to the Immigration Court by the BIA. On January 17, 2006, Rahardia was ordered removed to Indonesia. Rahardia appealed this decision to the BIA. On July 12, 2007, the case was again remanded to the Immigration Court. On April 23, 2008, Rahardia was again ordered removed to Indonesia. Rahardia appealed this decision to the BIA who dismissed the appeal on October 2, 2009. On October 26, 2009, he filed a PFR with the Third Circuit Court of Appeals. On March 2, 2010, the PFR was dismissed.

On November 2, 2016, Rahardia filed an I-130, Petition for Alien

Relative and an I-485, Application to Register Permanent Residence or Adjust Status with the United States Citizenship and Immigration Services (USCIS). On July 18, 2017, he filed an I-212, Application for Permission to Reapply for Admission Into the United States After Deportation or Removal with the USCIS. On February 7, 2019 the I-485 was administratively closed and the I-130 was approved. On the same date, the I-212 was denied. On October 28, 2016, Rahardia filed for a Motion to Reopen and Request for a Discretionary Stay of Removal with the BIA. On February 14, 2017, these motions were denied. On February 27, 2020, Rahardia was taken into ICE custody to execute the removal order. He was scheduled for removal on March 23, 2020, however that removal had to be postponed. He is currently scheduled for removal within the next 14 days. In addition, ICE reviewed Rahardia for release as part of its COVID-19 protocols and on April 6, 2020, released him from the York County Prison on an Order of Supervision with the requirement to report on April 17, 2020 for removal from the United States.

h. Rakibu Adam is a native and citizen of Ghana who applied for admission into the United States from Mexico at the San Ysidro Point of entry on September 14, 2014. On October 8, 2014, he was served a Notice to Appear and placed into removal proceedings. On March 18, 2015, an Immigration Judge set bond in the amount of $2,000. On March 23, 2015, Adam posted bond and was released from custody. On October 10, 2019, Adam was arrested in Dauphin County, Pennsylvania for two separate cases involving retail theft. On October 31, 2019, his immigration bond was cancelled, and he was detained in ICE custody at the York County Prison. Venue for his removal proceedings was transferred to York, Pennsylvania where he had a merit hearing on March 9, 2020. The Immigration Court is expected to issue a decision regarding Adam's case shortly. In addition, ICE reviewed Adam for release as part of its COVID-19 protocols and determined that continued detention was appropriate given his criminality and the guidelines for enforcement during the COVID-19 pandemic.

i. Yelena Mulchina is a native and citizen of Ukraine who initially entered the United States on February 26, 2006. She adjusted status to Lawful Permanent Resident on November 6, 2013. On December 16, 2019, she was convicted of possession of heroin. Additionally, she has a 2017

conviction for retail theft, two 2018 convictions for possession of drug paraphernalia, a 2018 arrest and order for clean slate for identity theft, access device fraud, receiving stolen property, possession of a controlled substance, and unauthorized use of an automobile. She was placed into removal proceedings in February 2020, has applied for cancellation of removal, and had a merits hearing scheduled for April 1, 2020. As the respondent was in medical quarantine on April 1, 2020, her merits hearing was rescheduled to May 12, 2020. In addition, ICE reviewed Mukhina for release as part of its COVID-19 protocols and determined that continued detention was appropriate given his criminality and the guidelines for enforcement during the COVID-19 pandemic.

j.  Nahom Gebletnisae is a native and citizen of Eritrea who entered the United States on March 1, 1998 as a Lawful Permanent Resident. On January 8, 2019, he was convicted of Acquisition of, Obtaining or Possession of a Controlled Substance by Misrep, Fraud, Forgery, Deception or Subterfuge (F). Shortly after his conviction, Gebletnisae absconded and as a result violated the conditions of his probation. On or about January 13, 2020, Gebletnisae was arrested for his probation violations. On February 18, 2020, he was released into ICE custody and placed into removal proceedings. He is next scheduled to appear before the Immigration Court on April 23, 2020.  His criminal history is as follows. On January 13, 2011, Gebletnisae was arrested by the Montgomery County Police Department in Maryland and charged with Assault 2nd degree and Mal Dest Prop/Value. A disposition is unknown at this time. On July 3, 2011, he was arrested by the Montgomery County PD in Maryland and charged with Mal Destr Prop Value. A disposition is unknown at this time. On or about September 13, 2012, he was arrested by the Montgomery County PD and charged with CDS: Poss Paraphernalia. These charges were Nolle Prosequi. On or about January 21, 2016, Gebletnisae was arrested by the Montgomery County PD and charged with CDS: Possess-Not Marijuana. On October 20, 2016, he was convicted and sentenced to probation. On January 27, 2016, Gebletnisae was arrested by the Delaware State Police Drug Diversion Unit and charged with Obtaining Controlled Substances by Misrepresentation, Fraud, Forgery 2nd and deception. On February 12, 2016, Gebletnisae was convicted of Forgery (misdemeanor). On April 2, 2016, Gebletniasae was arrested in Roanoke County, Virginia and charged with Prescriptions: Obtained by Fraud/Forgery/Etc. He failed

to appear. On July 13, 2016, he was arrested in New Castle County Court of Common Pleas after he violated the conditions of his probation. On July 11, 2017, Geblteniasae was arrested by the Montgomery County PD and charged with CDS: Possess-Not Marijuana. The case was nolle prosequi. On February 10, 2018, the subject was arrested by the Metropolitan PD in Washington, DC as a Fugitive from Justice. Disposition unknown at this time. On October 5, 2018, Gebletniasea was arrested by the Anne Arundel County PD and charged with Theft: $100 to under $1500. He failed subject failed to appear and a bench warrant was issued.

On October 18, 2018, Gebletniasea was arrested by the Berks County Sheriff Department and charged with Identity Theft, two counts of Forgery, two counts of Acquisition of, Obtaining or Possession of a Controlled Substance by Misrepresentation, Fraud, Forgery, Deception or Subterfuge and lastly Possession of Drug Paraphernalia. On January 8, 2019, the subject was convicted of both counts of Acquisition of, Obtaining or Possession of a Controlled Substance by Misrepresentation, Fraud, Forgery, Deception or Subterfuge and sentenced to no less than 82 days nor more than 23 months for count one- and four-years' probation for count 2. In addition, the subject was convicted of Possessing Drug Paraphernalia and was sentenced to one-year probation. On February 25, 2019, Gebletnisae was arrested in MD and charged with Fraud-Prescription Drug and sentenced to an unknown term of probation. On December 12, 2019, Gebletnisae was arrested by the Montgomery County PD in Maryland and charged with CDS: Poss-Not Marijuana, 2 counts of CDS: Possession Paraphernalia, CDS Admin Equip Possession/Distribution. Disposition unknown at this time. In addition, ICE reviewed Gebletnisae for release as part of its COVID-19 protocols and determined that continued detention was appropriate given his criminality and the guidelines for enforcement during the COVID-19 pandemic.

k.  Alexander Alvarenga is a native and citizen of El Salvador who initially entered the United States illegally without permission or parole. On August 1, 1991, he was granted Temporary Protected Status. On March 24, 1992, he was granted an extension to his Temporary Protected Status. On August 13, 1993, he adjusted status to Lawful Permanent Resident.

On October 2, 2018, Alvarenga was encountered pursuant to the Criminal Alien Program while incarcerated within the Moshannon Valley Correctional Institution in Philipsburg, Pennsylvania. He was convicted on November 27, 2017, in the United States District Court, District of Massachusetts for the offenses of Count 8 and 9, Distribution of Cocaine Base, Title 21 United States Code, Section 841(a)(1) and 841(b)(1)(C). For these offenses, the term of imprisonment imposed was 40 months. He was placed into removal proceedings with the filing of a Notice to Appear. On August 26, 2019, he was ordered removed from the United States to El Salvador. On September 24, 2019, he filed an appeal to the BIA. That appeal is still pending.

Alvarenga's additional criminal history is as follows. On May 7, 1995, he was convicted in the East Boston District Court, MA of Assault, Assault & Battery by a Dangerous Weapon, Assault & Battery and Threat to Commit Crime (to do bodily harm) for which a sentence of 2 years of probation was imposed. Alvarenga violated his probation and was sentenced to 1 year and 6 months incarceration. On November 4, 1995, he was convicted in the East Boston District Court for Assault and Battery for which a sentence of 1-year incarceration was imposed. On February 23, 1996, he was convicted in the East Boston District Court for Assault and Battery and Threat to Commit Crime (to do bodily harm) for which a sentence of 1-year incarceration was imposed. On July 12, 1999, he was convicted in the Chelsea District Court for Negligent Operation of Moto Vehicle and Operation of a Motor Vehicle Under the Influence of Liquor for which a sentence of 1-year probation was imposed. In addition, ICE reviewed Alvarenga for release as part of its COVID-19 protocols and determined that continued detention was appropriate given his criminality and the guidelines for enforcement during the COVID-19 pandemic.

l.  Viviana Ceballos is a native and citizen of Argentina who entered the United States on May 16, 1990 as a B-2 visitor. She married a United States Citizen and became a conditional resident on January 3, 1994. On January 3, 1996, the conditions were removed, and she was afforded Lawful Permanent Residence status. On January 5, 2002, Ceballos was arrested by the Suffolk Police Department in New York and charged with Driving While Ability Impaired by the Consumption of Alcohol. On March 21, 2002, she was convicted, sentenced to 90 days in jail (which was suspended) and she fined $500; On May 22, 2003, Ceballos

was arrested by the Nassau County Police Department and charged with Robbery-1st Degree: Use/Threatens Use of Dangerous Instrument. On December 9, 2003, Ceballos was convicted and sentenced to time served (over a year) followed by 5 years of probation. On May 27, 2018, she was arrested in Berks County and charged with Receiving Stolen Property. On September 13, 2018, she was convicted and sentenced to not less than 27 days nor more than 23 months' incarceration. Ceballos was then placed into immigration proceedings with the service of an NTA. On April 22, 2019, the Immigration Judge ordered her removed from the United States to Argentina. She appealed this order to the BIA. On October 11, 2019, the BIA dismissed her appeal. On October 24, 2019, Ceballos was resentenced in Berks County to probation for her Receiving Stolen Property conviction. She has filed a motion to reopen her removal proceedings with the BIA. That motion is still pending. In addition, ICE reviewed Ceballos for release as part of its COVID-19 protocols and determined that continued detention was appropriate given his criminality and the guidelines for enforcement during the COVID-19 pandemic.

m. Dembo Sannoh is a native and citizen of Sierra Leone currently detained at the York County Prison. He adjusted status to Lawful Permanent Resident on February 19, 2013. On April 10, 2014, he was convicted in the Delaware County Court of Common Pleas of Conspiracy and Possession with the Intent to Deliver .947 pounds of Marijuana. He was sentenced to one-year probation. On May 18, 2017, Sannoh was convicted in the Philadelphia County Court of Common Pleas of Possession with the Intent to Deliver Marijuana and Aggravated Assault. Sannoh was sentenced to one to two years and four to eight years imprisonment respectively. On February 11, 2019, while serving his sentence at SCI Laurel Highlands, Sannoh was served a notice to appear and placed into removal proceedings. On August 20, 2019, Sannoh was paroled from his state prison sentence into ICE custody. On November 12, 2019, the Immigration Court ordered Sannoh removed from the United States to Sierra Leone. Records show that on November 14, 2019, Sannoh was resentenced to time served for his Philadelphia County conviction for Possession with the Intent to Deliver Marijuana. On December 5, 2019, he filed an appeal of his removal order to the BIA which is still pending.

n. Jesus Angel Juarez is a native and citizen of Mexico who is currently

detained at the York County Prison. He was admitted to the United States on June 30, 2001 as a nonimmigrant B2 visitor with authorization to remain in the United States for a temporary period not to exceed 6 months. Juarez remained in the United States beyond 6 months without authorization from the Immigration and Naturalization Service or its successor the Department of Homeland Security. Juarez was placed into proceedings via the issuance of a Notice to Appear on 5/20/2013 after he was arrested for simple assault and encountered by Immigrations and Customs Enforcement in the Lebanon County Prison. On January 8, 2014, he was placed on ARD for Simple Assault by the Lebanon County Court of Common Pleas. Juarez's removal proceedings were administratively closed in Philadelphia on 4/06/2015 after he was approved for DACA on January 30, 2015.

On February 3, 2017, Juarez was arrested by the Pennsylvania State Police and charged with Possession of Cocaine and Marijuana. He was convicted of these offenses on 2/9/18 and filed a direct appeal to the Superior Court. Juarez filed an application to renew his DACA acceptance that was denied by USCIS on May 29, 2018. Juarez was arrested by members of the York County ICE ERO Field Ops Unit at Lebanon Probation on May 31, 2018 and his removal proceedings were reopened at York, PA. On July 3, 2018, he posted bond and was released from ICE custody. On December 7, 2018, Juarez's appeal of his Lancaster County Possession convictions were denied by the Pennsylvania Superior Court, making those convictions final for immigration purposes and making him subject to mandatory custody. Juarz was arrested again by members of the York County ICE ERO Field Ops Unit on January 16, 2019 outside his residence. At the time of his arrest, Juarez was found in possession of cocaine and was charged with possession by the Lebanon Police Department. On March 6, 2019, Juarez was convicted of Cocaine Possession and paroled into ICE custody on March 22, 2019. On April 22, 2019, Juarez was ordered removed from the United States to Mexico by the Immigration Court in York, Pennsylvania. On June 3, 2019, he was removed from the United States to Mexico.

o. Jesus De La Pena is a citizen and native of Mexico. He entered the United States at an unknown time and place without being inspected or paroled. An NTA was issued on March 2, 2011 charging him with inadmissibility § 212(a)(6)(A)(1) of the INA as an alien present in the

United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. After a merits hearing where he sought cancellation of removal and adjustment of status for non-lawful permanent residents, De La Pena was granted relief in December 2019. DHS appealed the outcome of the appeal with the Board is pending. On April 25, 2019, the Immigration Judge denied bond, finding that De La Pena posed a danger to the community largely due to his extensive criminal history. De La Pena filed multiple motions to reconsider bond and custody, which the IJ reconsidered based on the grant of relief as a change in circumstances. On February 25, 2020, the Immigration Judge ultimately denied bond again, based on the extensive criminal history and the nature of past De La Pena's criminal conduct.

De La Pena's criminal history spans a decade. Was arrested by the New York City Police on April 26, 2008 for a violation of VTL § 1192.02, Operation of a Motor Vehicle with .08% of 1 & Alcohol or More in Blood—First Offense  and was convicted on March 5, 2009.   On October 28, 2009 he was arrested under New York Penal Law § 265.01.01 Criminal Possession Weapon 4th Degree which was ultimately dropped.  He was also charged under New York Penal Law § 240.20 Disorderly Conduct and was convicted. He was first encountered by ICE on or about March 2, 2011 while incarcerated at Rikers Island Correctional Facility on the above cases and was identified by the New York City Criminal Alien Program as a Criminal Alien.

On November 24, 2011, De La Pena was arrested by New York City Police Department for a subsequent Driving While Intoxicated. Disposition is unknown. On March 15, 2012, the New York City Police Department arrested him for New York Penal Code § VTL 1192.03 Driving While Intoxicated 1st offense, VTL § 0511.01A Aggravated Unlicensed Operation of a Motor Vehicle 3rd Degree, and New York Penal Law § 221.05, Unlawful Possession of Marijuana; and, VTL 0375.30 Equipment Violation: obstructed vision.  He was convicted on March 21, 2012 of Disorderly Conduct.  On February 2, 2016, New York City Police Department arrested him for Criminal Mischief-Intent to Damage Property, Unauthorized Use Vehicle-Without Owner Consent, and Resisting Arrest.   De La Pena was convicted of Unauthorized Use Vehicle-Without Owner Consent on May 26, 2016.

De La Pena was arrested on March 15, 2018 by New York City Police Department for Possession Forged Instrument-3rd Degree charges. No action was taken on this charge. De La Pena came to the attention of the Pike ERO office following his arrest on March 09, 2019 by the Pennsylvania State Police-Dunmore Barracks. The criminal history record lists the arresting agency as the Lackawanna County Detectives, but ERO was informed that the ORI was incorrect. De La Pena was charged with Violation of CS/Drug/Dev and Cosmetic Act and DUI of Alcohol or Controlled Substance. De La Pena admitted to ERO officers that he occasionally uses Marijuana. At the time of arrest, De La Pena was in possession of a small plastic bag that contained remnants of Marijuana. Charges are expected to be filed before the Magisterial Court.

p. Duc Viet Lam is a citizen and native of Vietnam. He was admitted to the United States on or about June 28, 2007, as a nonimmigrant visitor for pleasure (B-2) with authorization to remain in the United States for a temporary period not to exceed December 25, 2007. He remained in the United States beyond December 25, 2007, without authorization. On August 29, 2008, the subject was served a Notice to Appear pursuant to section 237(a)(1)(B) of the Immigration and Nationality Act. A NTA was issued on August 20, 2009 charging respondent under Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, he remained in the United States for a time longer than permitted, in violation of this Act or any other law of the United States. It was later learned that Lam included fraudulent information during his process to gain entry and to remain in the United States. Lam claimed to be a citizen of Germany on his Form I-485 which contradicted his refugee travel document from Germany that listed his nationality as Vietnamese, and other documentation that likewise reflected he was a Vietnamese citizen. Lam possessed no evidence to support German citizenship. The United States Consulate in Frankfort confirmed that Lam's nonimmigrant visa application (Form DS-156) reflected that he married a USC wife on May 30, 2007. However, one month after entering the United States, Lam married a naturalized USC on July 27, 2007. Lam attempted to adjust status but was his Forms I-485 and I-130 were denied by USCIS on January 22, 2008 based on a prior marriage in Germany for which Lam could not produce a divorce decree. Lam later filed another I-130 with UCIS on September 13,

2010, that was denied on September 27, 2011. On August 2, 2011, the subject was ordered removed in absentia by an Immigration Judge at Philadelphia, PA for failure to appear to his hearing.

On June 19, 2018, the subject was arrested by the Pennsylvania State Police Gaming Enforcement Unit for the following charges: Disorderly Conduct Engage in Fighting; Unlawful to Take/Claim/Manipulate/with Intent to Defraud/Cheat; and, Knowingly by Trick/Fraud/Manipulation Win or Reduce a Loss. The second and third charges were withdrawn. The Disorderly Conduct charge was moved to a non-traffic court as a summary offense and is awaiting final dispositions. On January 8, 2020, Lam was arrested by the Pennsylvania State Police Gaming Enforcement Unit for Disorderly Conduct Engage in Fighting, Unlawful to Take/Claim/Manipulate/with Intent to Defraud/Cheat, Knowingly by Trick/Fraud/Manipulation Win or Reduce a Loss. A detainer was lodged by PERC on January 9, 2020. Lam sought a motion to reopen his underlying case based on a pending Form I-130 with a new lawful permanent resident wife which was granted on February 14, 2020.

q. Brisio Balderas-Dominquez entered the United States on October 6, 1993 at the Del Rio, Texas Port-of-Entry and was admitted as a Lawful Permanent Resident. He is a citizen and native of Mexico by birth. is in violation of Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (Act), as amended, in that, at any time after admission, you have been convicted of an aggravated felony as defined in section 101(a)(43)(N) of the Act. Balderas was previously a Lawful Permanent Resident who entered the United States on October 6, 1993 in Del Rio, TX. He was encountered by ICE/ERO in Del Rio, TX and was issued a Notice to Appear on October 27, 2011. Balderas was charged as deportable under Section 237a2Aiii. Balderas filed applications for Withholding of Removal under the ACT and Withholding of Removal under the Convention Against Torture. Form I-261 filed charging respondent with Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (Act), as amended, in that, at any time after admission, you have been convicted of an aggravated felony as defined in section 101(a)(43)(U) of the Act, a law relating to an attempt or conspiracy to commit an offense described in this paragraph. In support of the amended/additional charge.

On May 8, 2012, the Immigration Judge at San Antonio, TX granted Withholding of Removal and Denied Withholding under CAT. On September 27, 2012 the Board of Immigration Appeals vacated the grant of Withholding of Removal and ordered Balderas removed. Balderas was removed from the United States to Mexico on October 1, 2012 at Laredo, TX.  DHS appealed IJ grant of withholding of removal to Mexico pursuant to 241(b)(3) of the INA.

Balderas illegally reentered the United States on an unknown date at an unknown location without admission or parole by an Immigration Officer. Balderas was encountered by US Deputy Marshals in Midland, TX on August 8, 2013 and arrested for a probation violation. Balderas was subsequently prosecuted for Illegal Re-entry.

Balderas' criminal history spans three decades.  He was convicted on December 4, 1997 in the Comanche County Court, TX for Criminal Trespass and was sentenced to 15 days imprisonment suspended. He was arrested by the Mason, Texas Sheriff's Office for Aggravated Assault with a Deadly Weapon. He was convicted in the Court of Mason County, TX of the lessor crime of Terroristic Threats and sentenced to 180 days imprisonment suspended followed by one year of probation.  He was on October 18, 2011 convicted in the United States District Court, Western District of Texas Del Rio Division for the offense of Conspiracy to Transport Illegal Aliens and was sentenced to 21 months imprisonment.

On October 18, 2011, he was arrested for Marijuana Possession 3562. He was arrested by the DEA in Rio, Texas for Marijuana Possession on February 2, 2012.

On July 1, 2013, he was arrested for a Traffic Offense.  He was convicted of all of the aforementioned charges on August 28, 2013. On June 30, 2013, he was arrest in Menard County for Driving While License Invalid.  No action was taken.  On August 28, 2013, Balderas-Dominquez was arrested by the United States Marshals for Supervised Released Violation with the US Probations.  On March 27, 2014, he was charged in U.S. District Court with Illegal Re-Entry under INA § 101(a)(43)(O), 8 U.S.C. § 1326.

On March 27, 2014 he was convicted in the United States District

Court, Western District of Texas Midland Division for the offense of Illegal Re-entry after Deportation and was sentenced to 46 months imprisonment. BALDERAS was also sentenced to 12 months for violating his Supervised Release. 07/26/2017 09:58 BALDERAS was encountered by Allenwood ICE/ERO CAP while incarcerated at the Federal Bureau of Prisons, Moshannon Valley Correctional Institution under Registration #54652-280. BALDERAS has a projected release date of August 21, 2017.

r.  Coswin Ricardo Murray is a citizen and national of Barbados. Murray entered the United States at New York, NY on or about August 06, 1986 as a nonimmigrant B2 Visitor. He failed to depart the United States as required.

Murray was charged as being a deportable alien on June 28, 2010. Administrative final order. Last custody review was August 20, 2019. Ordered removed to Barbados on November 18, 2019. Murray filed a PFR with the Third Circuit Court of Appeals which they dismissed March 31, 2020.

Murray was convicted of Disorderly Conduct on June 24, 2010. He was initially placed in removal proceedings on August 23, 2010 and was released on the ISAP program on June 28, 2010. Since being released on ISAP, Murray was charged with criminal contempt in New York State. As a result, Murray violated the conditions of his ISAP release and returned to ICE custody.

Murray has a history of violating bond through criminal conduct. He was convicted of Disorderly Conduct 06/24/2010. He was arrested by the New York City Police Department on November 18, 2010 for the offenses of: Assault 3rd with Weapon and Menacing 2nd: Weapon. There appears to be no disposition on these charges. MURRAY was arrested by the Wilkes-Barre, Pa. Police Department on August 15, 2013 for the offense of Simple Assault. These charges were dismissed on August 27, 2013.

On May 20, 2019, Murray was arrested by the Wilkes-Barre, Pa. Police Department on May 30, 2019 for the offenses of: Simple Assault and Harassment. These charges were dismissed on June 11, 2019. While Murray was out on bond for his removal proceedings, with a master

calendar hearing scheduled for November 1, 2021, he was arrested by the Wilkes-Barre, Pa. Police Department on August 07, 2019 for the offenses of: Aggravated Assault, Simple Assault and Recklessly Endangering Another Person. It should be noted that according to the Police report, Murray attacked his spouse with a meat cleaver. Murray was convicted of Simple Assault on December 17, 2019.

s.  Druckens Max Adler Francois is a native of Haiti and a citizen of Haiti by virtue of birth. FRANCOIS entered the United States as a Lawful Permanent Resident P-22 on April 19, 1986 through New York, New York. It was verified that the subject entered through New York, New York on or about April 19, 1986 as a Lawful Permanent Resident. 237a02Bi-Controlled Substance Conviction.  Subject is amenable for removal under Section 237(a)(2)(B)(i) of the Immigration and Nationality Act, as amended, in that, at any time after admission, you have been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in Section 102 of the Controlled Substances Act, 21 U.S.C. 802), other than a single offense involving possession for one's own use of 30 grams or less of marijuana. A charging document was issued on October 18, 2019.

The Subject was scheduled for an individual merit hearing on March 30, 2020. Subject's counsel requested that the individual hearing be continued to a later date in order to have a Doctor conduct a competency evaluation at the Pike County Jail or through video teleconference. Subject's counsel also requested that the hearing be continued due to the current events regarding COVID-19 and her risk to exposure. The individual merits hearing was reset to May 15, 2020.

Francois has 20 years of criminal contacts and narcotics violations. Subject was arrested on July 24, 1999 by Philadelphia Police and was charged with Criminal Mischief, Theft by Unlawful Taking or Disposition, and Burglary. Disposition is unknown for this case. On December 3, 1999, Francois was arrested by Philadelphia Police and was charged with Criminal Mischief and Burglary.  Disposition unknown.  On November 17, 2002, he was arrested by Philadelphia Police and charged with violations of the VIO CS/ DRUG/ DEV AND COSMETIC ACT (CS13A31) and VIO CS/ DRUG/ DEV AND COSMETIC ACT (CS13A16).  Francois was convicted and given 30

days probation. Francois was arrested on July 26, 2006 by Philadelphia Police and was charged with one count of Criminal Mischief and two counts of Receiving Stolen Property. After conviction of all charges on January 12, 2007, Francois was sentenced to nine months county probation. On August 14, 2009, the Philadelphia Police arrested Francois and charged him with two counts of Burglary, one count of Theft by Unlawful Taking or Disposition, and one count of Receiving Stolen Property. On October 19, 2010, Francois was acquitted on all charges.

On April 14, 2014, Philadelphia Police arrested Francois and charged him with one count of VIO CS/ DRUG/ DEV AND COSMETIC ACT. On December 4, 2017, all charges were nolle prossed/withdrawn. On November 10, 2017, Francois was arrested by Philadelphia Police and was charged with one count of VIO CS/ DRUG/ DEV AND COSMETIC ACT (CS13A16) and one count of VIO CS/ DRUG/ DEV AND COSMETIC ACT (CS13A30). On January 18, 2018, FRANCOIS was convicted in the United States Municipal Court, Pennsylvania, for the offense of Manufacture, Delivery, or Possession with Intent to Manufacture or Deliver, to wit: Marijuana in violation of PA 35 § 780-113(A30) and was sentenced to 23 months in County Prison. On January 18, 2018, he was convicted and sentenced to 23 months incarceration in County Prison followed by 12 months' probation. On May 8, 2018, Francois was arrested by Philadelphia Police and was charged with one count of VIO CS/ DRUG/ DEV AND COSMETIC ACT (CS13A16) and one count of VIO CS/ DRUG/ DEV AND COSMETIC ACT (CS13A30). He was convicted on February 19, 2019 in Philadelphia Municipal Court, Pennsylvania, for the offense of Intent Possession Controlled Substance by Person Not Reg, to wit: Marijuana in violation of PA35 §780-113(A16) and was sentenced to No Further Penalty.

t.  Edwin Crisostomo Rodriguez is a native and citizen of the Dominican Republic who entered the United States illegally without permission or parole. Rodriguez was arrested by the Philadelphia Police Department on November 8, 2019 and charged with Manufacturing, Delivery, and Possession with the Intent to Deliver a controlled substance. He was apprehended by ERO on February 20, 2020, on Filbert Street in Philadelphia, Pennsylvania and placed into removal proceedings. On March 3, 2020, the Immigration Court denied Rodriguez bond because

he constituted a danger to the community.  Removal proceeding are pending before the Immigration Court in York, Pennsylvania.

u. Elton Bernard Briette is a native of Turks And Caicos and a citizen of the United Kingdom. He entered the United States as an P63 Child of an alien classified as P6-1 Lawful Permanent Resident on March 26, 1990, into Miami, Florida. Briette was convicted of an aggravated felony and drug trafficking in Philadelphia, Pennsylvania.  He is removal under Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (Act), as amended, in that, at any time after admission, you have been convicted of an aggravated felony as defined in Section 101(a)(43)(B) of the Act, an offense relating to the illicit trafficking in a controlled substance, as described in section 102 of the Controlled Substances Act, including a drug trafficking crime, as defined in section 924(c) of Title 18, United States Code. Additionally, he is removable under Section 237(a)(2)(C) of the Immigration and Nationality Act, as amended, in that, at any time after admission, you have been convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying, or of attempting or conspiring to purchase, sell, offer for sale, exchange, use, own, possess, or carry, in violation of any law, any weapon, part, or accessory which is a firearm or destructive device, as defined in Section 921(a) of Title 18, United States Code.

He was placed into removal proceedings where on February 12, 2020, the Immigration Court ordered him removed from the United States to Turks and Caicos or in the alternative the United Kingdom.

Briette has 29 years-worth of documented criminal history that began only a few months after he arrived in the United States. On April 19, 1991 he was arrested by Philadelphia Police and was charged with: VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16. On October 9, 1992, he was found guilty and was sentenced (1) year probation.  On October 2, 1991 Briette was arrested by Philadelphia Police and was charged with: 1.VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16, and VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A30. On February 1992, he was sentenced to country probation without a verdict on both counts.

On January 17, 1994 Briette was arrested by Philadelphia Police and was charged with: VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16, and VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A30. Briette was convicted of both counts on June 23, 1994 and was sentenced on October 24, 1994 to six to 12 months house arrest followed by two years' probation.

Briette was arrested by Philadelphia Police on April 5, 1994 for: CRIMINAL CONSPIRACY, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A30. On October 12, 1994 he was convicted and sentenced to six to 12 months house arrest followed by two years' probation. On May 30, 1996, Briette was arrested by Philadelphia Police and was charged with two counts of Theft by Unlawful Taking or Disposition, Criminal Conspiracy, Criminal Mischief. Briette was found guilty on September 29, 1997 and was sentenced to 11 to 23 months incarceration in PCP on Counts (1& 2). He was acquitted on count (3) BRIETTE was acquitted.

On October 22, 1994 Briette was arrested by Philadelphia Police and was charged with: VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A30, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16. No Disposition was reported for this case. On 05/29/1996 BRIETTE was arrested by Philadelphia Police and was charged with: Theft by Unlawful Taking or Disposition, Criminal Conspiracy, Criminal Mischief, Theft by Unlawful Taking. On September 29, 1997, he was found guilty and was sentence to (1)- (2) years' incarceration in PCP, on Count (2), he was acquitted on Count (3), Count (1) disposition was not reported, and Count (4) BRIETTE was sentenced to (1)- (2) years' incarceration in PCP.

On December 19, 1996, Briette was arrested by Philadelphia Police and was charged with: VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A30. On October 15, 1997, he was found guilty and was sentenced to

six months to 12 months incarceration in PCP on Count one and was acquitted on Count two.

On February 2, 1997 Briette was arrested by Philadelphia Police and was charged with: Possessing Instrument of a Crime, Firearm Carried without License, Carrying Firearms in Philadelphia, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A30. On November 14, 1997 all charges were nolle prossed/withdrawn. On 09/28/2001 Briette was arrested by Philadelphia Police and was charged with: Possessing Instrument of Crime, Theft by Unlawful Taking or Disposition, Receiving Stolen Property, Firearm Carried without License, Carrying Firearms in Philadelphia, and Persons Not to Own a Firearm.  On November 22, 2002 he was convicted and was sentenced to six to 23 months in prison followed by three years' probation.

On June 3, 2003, he was arrested by Philadelphia Police and was charged with:VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16.  The charges were dismissed on December 1, 2003.   On June 20, 2005, he was arrested by Philadelphia Police and was charged with: VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16. He was convicted and was incarcerated in County Prison with no amount of time was specified. On March 25, 2006 Briette was arrested by Philadelphia Police and was charged with: VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A31.  On July 20, 2006, he was found guilty and sentenced to County Prison on Count (1) no specified amount of time and count two was nolle prossed/withdrawn.

On April 1, 2006, Briette was arrested by Philadelphia Police and was charged with: 1.VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A31, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A31, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16.  On November 3, 2006, he was found guilty and sentenced to County Prison with no specified time on Count one, on Count two no disposition reported, and Count three was nolle

prossed/withdrawn.    June 27, 2006, Briette was arrested by Philadelphia Police and was charged with: Theft by Unlawful Taking or Disposition, Receiving Stolen Property, Unsworn Falsification To Authorities.  All of these charges were nolle prossed/withdrawn on August 14, 2006.

On December 28, 2006, he was arrested by Philadelphia Police and was charged with: VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A30, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16. Briette was convicted of both counts on August 25, 2010.  One Count one, he was sentenced to one to three years prison, on Count two, he had a determination of guilty without further penalty.

On July 10, 2010, Briette was arrested by Philadelphia Police and was charged with: VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A31, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A30, VIO CS/DRUG/ DEV AND COSMETIC ACT 35 SUB SECTION 780-113 SUB SECTION A16.  On October 14, 2010, all charges were nolle prossed/withdrawn.  On August 16, 2018, he was arrested by Philadelphia police and was charged with: Possessing and Instrument of Crime, Simple Assault, Aggravated Assault, Recklessly Endangering, False Identity to Law Enforcement, Not Procession-Use Transfer Firearm, Firearm Carried without License, Carrying Firearm in Philadelphia.    On March 1, 2019, all charges were nolle prossed/withdrawn.  On October 07, 2019, BRIETTE, Eldon was arrested in Philadelphia Police and charged with: Stalking Repeatedly Commits Act, Criminal Mischief, Harassment-Subject Other to Physical Contact. The charges are still pending.

v. Armando Avecilla is a citizen and native of Panama. On December 16, 2009, Avecilla applied for admission to the United States from Mexico through the pedestrian primary lanes of the San Ysidro, CA Port of Entry by presenting a DSP-150 (B1/1B2 visa) bearing the name and photo of Arturo Estrada Pitones. It was discovered that Avecilla was in fact an impostor to the document presented. He was subsequently found to be inadmissible to the United States pursuant to section(s) Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an immigrant who, at the time of application for

admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document; and, Section 212(6)(C)(i) of the Immigration and Nationality Act, as amended, as any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or sought to procure or has procured), a visa, other documentation, or admission into the United States or other benefit. U.S. Customs and Border Protection (CBP) served him with a Notice and Order of Expedited Removal. An asylum pre-screening officer issued him a Notice to Appear on January 21, 2010.

Avecilla sought relief in the form of Asylum pursuant to INA§ 208(a); Withholding of Removal pursuant to INA § 241 (b )(3 ); and protection under Article III of the Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment ("CAT" or "Convention Against Torture"). His application for relief was denied in March 2020 and he was ordered removed to Panama. As of April 7, 2020, Avecilla has not filed a Notice of Appeal with the Board of Immigration Appeals, which would be due by April 20, 2020.

On July 29, 2017, Avecilla was arrested by New York City Police for larceny and criminal possession of stolen property. On November 6, 2017, subject was convicted; however, the sentence is unknown. On December 15, 2017, AVECILLA was arrested by New York City Police for larceny and criminal possession of stolen property. On December 16, 2017, the charges were downgraded to disorderly conduct and subject was sentenced to five days of community service. On September 26, 2018, Avecilla was arrested by New York City Police for Grand Larceny 4th Degree: Value Property Greater Than $1000, Petit Larceny, Criminal Possession Stolen Property 4th Degree:Property Value Exceeds $1000 and Criminal Possession Stolen Property 5th Degree. October 15, 2018, the case was completed and Avecilla was convicted; however, the sentence is unknown. On December 11, 2018, Avecilla was arrested by Pennsylvania's Bureau Criminal Investigation for criminal conspiracy engaging - manufacture, delivery, or possession with intent to manufacture or deliver; manufacture, delivery, or possession with intent to manufacture or deliver; intent to possess controlled substance by person not reg; and use/possession of drug paraphernalia. The disposition of the case in unknown.   Avecilla received a conviction for Receiving Stolen Property on September 9, 2019.

21.   As of the morning of April 7, 2020, the Philadelphia Field Office (ERO) has the following information.

    a.   At the York County Prison one ICE detainee has tested positive for COVID-19. She is currently in quarantine in a negative pressure isolation room under medical observation.

    b.   At the Pike County Prison approximately four ICE detainees and several other county inmates have tested positive for COVID-19. They are in quarantine under medical observation. The last information reported to ERO is that five correctional officers have tested positive for COVID-19. They are under self-quarantine.

22.   As of the morning of April 7, 2020, the Philadelphia Field Office (ERO) has the following information regarding recent procedural changes in response to COVID-19.

    a.   In response to COVID-19, the York County Prison now requires that all staff, contractors, ERO personnel, and medical staff wear an N95 mask. All kitchen staff are now assigned surgical masks. Detainees who work in the kitchen are required to wear surgical masks. Detainees on isolation status are required to wear a N-95 mask when they leave a cohorted housing unit. Additionally, any detainees being transported to a hospital or outside medical appointment or as directed by PrimeCare medical staff, will be required to wear a surgical mask.

    b.   In response to COVID-19, the Pike County Prison has instituted a modified lockdown schedule. Movement throughout the facility is restricted. Detainees ability to leave their cells is staggered in order to promote social distancing. All detainees must maintain social distancing when not housed within the same cell. Meals are now served to detainees within their cells. All staff are now required to wear masks within the facility. Daily temperature checks and screening for influenza like illness (ILI) symptoms have been implemented for all detainees. If any detainee displays ILI symptoms, they along with any cell mates, are placed in quarantine. Staff has increased the frequency of cleaning and disinfecting, including often used touch surfaces.

23. Pertaining to detainee access to news related content or programming, the Philadelphia Field Office (ERO) has the following information.

    a. At the York County Prison all detainees have access to various media outlets, including news outlets, via television.

    b. At the Pike County Prison all detainees have access to various media outlets, including news outlets, via television.

Joseph Dunn
Assistant Field Office Director
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement